MARVIN COBLE *v.* BRIAN P. MALONEY ET AL.
(11780)

LANDAU, HEIMAN and SCHALLER, Js.

Argued December 2, 1993—decision released June 14, 1994

*John T. Scully,* for the appellants-appellees (defendant Archie & Frankie's, Inc., et al.).

*Ann R. Stravalle-Schmidt,* with whom, on the brief, were *Melvin A. Simon* and *Sara Slade,* law student intern, for the appellee-appellant (plaintiff).

SCHALLER, J. The defendants[1] Archie & Frankie's, Inc., and Vincent Howe (The Pub Cafe)[2] appeal from the judgment of the trial court, rendered after a jury verdict, in favor of the plaintiff, Marvin Coble, on one count of wilful, wanton and reckless misconduct, and on one count of violation of General Statutes § 30-102

---

[1] In a consolidated trial, the jury also returned a verdict against the named defendant, Brian P. Maloney, in the amount of $178,576 on count one of the complaint, which alleged negligence, and in the amount of $100,000 on count four of the complaint, which alleged wilful, wanton and reckless conduct. Maloney has not appealed the judgment rendered against him.

[2] Archie & Frankie's, Inc., is the financial backer and Vincent Howe is the permittee for The Pub Cafe. The terms defendants and The Pub Cafe hereinafter shall refer to Archie & Frankie's, Inc., and Vincent Howe.

(Dram Shop Act).[3] On appeal, the defendants claim that the trial court improperly (1) denied the defendants' motion in limine to preclude the introduction of evidence of codefendant Brian Maloney's blood alcohol level unless accompanied by expert testimony, (2) admitted the out-of-court statements of codefendant Maloney, contained in a police officer's report, (3) failed to grant the defendants' motion for a directed verdict and motion for judgment pursuant to Practice Book § 321 regarding the wilful, wanton and reckless misconduct count, and (4) instructed the jury with regard to the wilful, wanton and reckless misconduct count. We affirm the judgment of the trial court.[4]

The jury reasonably could have found the following facts. After work on April 5, 1988, Maloney arrived at his home in Southington at about 6 p.m. Maloney showered, got dressed and had one or two beers. At

---

[3] General Statutes § 30-102 provides in pertinent part: "If any person, by himself or his agent, sells any alcoholic liquor to an intoxicated person, and such purchaser, in consequence of such intoxication, thereafter injures the person or property of another, such seller shall pay just damages to the person injured, up to the amount of twenty thousand dollars, or to persons injured in consequence of such intoxication up to an aggregate amount of fifty thousand dollars, to be recovered in an action under this section . . . ."

[4] The plaintiff has filed a cross appeal, in which he claims that the trial court improperly (1) denied the plaintiff's motion to find The Pub Cafe and Maloney jointly and severally liable for the total amount of the jury verdicts, and (2) denied the plaintiff's motion to set aside the verdict and to increase the amount of the award with regard to the violation of General Statutes § 30-102. The plaintiff filed a motion after oral argument, pursuant to Practice Book § 4038, seeking permission for a conditional withdrawal of his cross appeal. Section 4038 provides in pertinent part that "[p]rior to oral argument, an appeal or writ of error may be withdrawn as of right; *thereafter it may be withdrawn only on motion to the court in which the appeal is pending.*" (Emphasis added.) In his motion, the plaintiff states that he wants to withdraw the cross appeal if this court affirms the trial court's judgment. Under the unique circumstances of this case and because the condition has been fulfilled, we grant the plaintiff's motion to withdraw his cross appeal. See *Carlino* v. *Meriden*, 132 Conn. 394, 396, 44 A.2d 823 (1945).

approximately 7:30 p.m., Maloney departed for New Haven, where he planned to go to two bars, The Pub Cafe and Partners, both of which he had visited on numerous occasions. When Maloney arrived in New Haven at about 8:30 p.m., he parked his car in a lot across the street from The Pub Cafe, which is located on York Street. He then had dinner alone at the Brass Button, a restaurant also located on York Street, several buildings from The Pub Cafe. While at the Brass Button, Maloney had two or three "White Russians."[5]

Maloney intended to become intoxicated that night. After dinner, between 9:30 and 9:45 p.m., Maloney walked to The Pub Cafe, where he leisurely drank two to three more White Russians. He then walked to Partners, a bar located just around the corner from The Pub Cafe. Maloney stayed briefly at Partners and consumed two more White Russians. At approximately 11:30 p.m., in an intoxicated state, Maloney, alone and unassisted, walked back to The Pub Cafe, where he was served one more White Russian. Maloney then lost memory of any further events until those occurring at the Meriden-Wallingford Hospital early in the morning on April 6, 1988.

Sometime after leaving The Pub Cafe, Maloney retrieved his car from the parking lot, and drove north toward Hartford. Subsequently reversing his direction, he entered Interstate 91, without having turned on his headlights, and traveled south in one of the northbound lanes. At approximately 1 a.m. on April 6, 1988, Maloney's vehicle struck the plaintiff's vehicle, which had been traveling north in one of the northbound lanes, slightly south of exit 18. Both the plaintiff and Maloney suffered injuries as a result of the collision.

---

[5] The testimony of George Coyle, a bartender at The Pub Cafe on the evening of April 5, 1988, revealed that a White Russian contains about one-third each vodka, Kahlua, and half and half.

State Trooper Edward Roche and an ambulance arrived on the scene at approximately the same time. Because of the injuries suffered by Maloney and the medical treatment given to him at the scene, Roche was unable to conduct many of the standard field tests for sobriety. On the bases of the nature of the accident, Maloney's actions at the scene, the odor of alcohol on his breath, and Maloney's statement that he had been drinking, Roche determined that Maloney was intoxicated and that probable cause existed to believe that Maloney was under the influence of intoxicating liquor at the time of the accident.

Maloney was transported to Meriden-Wallingford Hospital. Two blood alcohol tests[6] were administered

---

[6] In order for blood test results to be admissible to establish a per se offense of driving while under the influence of intoxicating liquor pursuant to General Statutes § 14-227a (a) (2), several procedural guidelines, which are set forth in General Statutes § 14-227a (c), must be met.

General Statutes § 14-227a (c) provides: "Except as provided in subsection (d) of this section, in any criminal prosecution for violation of subsection (a) or (b) of this section, evidence respecting the amount of alcohol or drug in the defendant's blood or urine at the time of the alleged offense, as shown by a chemical analysis of the defendant's breath, blood or urine shall be admissible and competent provided: (1) The defendant was afforded a reasonable opportunity to telephone an attorney prior to the performance of the test and consented to the taking of the test upon which such analysis is made; (2) a true copy of the report of the test result was mailed to or personally delivered to the defendant within twenty-four hours or by the end of the next regular business day, after such result was known, whichever is later; (3) the test was performed by or at the direction of a police officer according to methods and with equipment approved by the department of health services and was performed by a person certified or recertified for such purpose by said department or recertified by persons certified as instructors by the commissioner of health services. If a blood test is taken, it shall be on a blood sample taken by a person licensed to practice medicine and surgery in this state, a qualified laboratory technician, an emergency medical technician II or a registered nurse; (4) the device used for such test was checked for accuracy immediately before and after such test was performed by a person certified by the department of health services; (5) an additional chemical test of the same type was performed at least thirty minutes after the initial test was performed, provided however the results of the initial test shall not be inadmissible under this subsection if reasonable efforts

at the hospital at approximately 3:05 and 3:39 a.m. The first test revealed a blood alcohol content of 0.14 percent, while the second revealed a blood alcohol content of 0.12 percent. Additional facts will be set forth as necessary for the resolution of the individual claims.

I

BLOOD ALCOHOL TESTS

The defendants first contend[7] that the trial court improperly denied their motion in limine regarding the two blood alcohol tests. Specifically, the defendants claim that the test results should not have been introduced without expert testimony to extrapolate the data back to the time that The Pub Cafe allegedly served Maloney his last drink. The defendants make two arguments regarding this claim. First, they contend that, with regard to the dram shop count, while a blood alcohol level exceeding 0.10 percent is indicative of an individual's being "under the influence of intoxicating liquor" while operating a motor vehicle pursuant to § 14-227a (a) (2), such a reading does not prove that an individual is intoxicated. Second, they allege that, even if the blood alcohol tests do bear some indication of Maloney's intoxication, without some limit or explanation of the data, the admission of the blood alcohol test

were made to have such additional test performed in accordance with the conditions set forth in this subsection and such additional test was not performed or was not performed within a reasonable time, or the results of such additional test are not admissible for failure to meet a condition set forth in this subsection; and (6) evidence is presented which demonstrates that the test results and the analysis thereof accurately reflect the blood alcohol content at the time of the alleged offense."

[7] At oral argument, we questioned the parties regarding whether the trial court had rendered a final judgment for purposes of appeal. The judgment on the verdicts against Maloney were not rendered until issues concerning collateral source recovery were determined, which occurred after this appeal by The Pub Cafe had been taken. We conclude, however, that pursuant to *State* v. *Curcio,* 191 Conn. 27, 463 A.2d 566 (1983), the judgment rendered against The Pub Cafe is an appealable final judgment.

results severely prejudiced the defendants and constituted harmful error.

"Our standard of review of issues involving evidentiary rulings is that we will set aside on appeal rulings on evidentiary matters only upon a showing of a clear abuse of discretion. *Hall* v. *Burns,* 213 Conn. 446, 451, 569 A.2d 10 (1990); *Munson* v. *United Technologies Corporation,* 28 Conn. App. 184, 189, 609 A.2d 1066 (1992)." *Gemme* v. *Goldberg,* 31 Conn. App. 527, 539, 626 A.2d 318 (1993). "In determining whether the trial court has abused its broad discretion, we will afford every reasonable presumption in favor of the correctness of its ruling. . . . The ultimate issue to be determined in a claim involving an alleged abuse of the trial court's discretion is whether the trial court could reasonably conclude as it did." (Citations omitted.) Id., 538. In addition, once we determine that an abuse of discretion has occurred, "our next inquiry is whether the court's evidentiary rulings constituted harmful error. To be reversible, evidentiary error must be both wrong and harmful. *Sanderson* v. *Steve Snyder Enterprises, Inc.,* 196 Conn. 134, 142, 491 A.2d 389 (1985); *De Carufel* v. *Colonial Trust Co.,* 143 Conn. 18, 21, 118 A.2d 798 (1955). The appellant bears the burden of establishing the specific harmfulness of the error. See *Braun* v. *Edelstein,* 17 Conn. App. 658, 554 A.2d 1102, cert. denied, 211 Conn. 803, 559 A.2d 1136 (1989)." *Sokolowski* v. *Medi Mart, Inc.,* 24 Conn. App. 276, 282, 587 A.2d 1056 (1991).

In order to prove that a sale of intoxicating liquor was made in a wilful, wanton and reckless manner, the plaintiff must demonstrate that the defendants acted in a manner that tended to take on the aspect of " 'highly unreasonable conduct, involving an extreme departure from ordinary care, in a situation where a high degree of danger is apparent.' " *Dubay* v. *Irish,* 207 Conn. 518, 533, 542 A.2d 711 (1988). Proof of a

certain blood alcohol content is not necessary to establish that the defendant acted in a wilful, wanton and reckless manner in dispensing alcohol.

To establish a violation of General Statutes § 30-102, three elements must be proven. "In each case . . . the trier must decide as a question of fact: whether there was (1) a sale of intoxicating liquor (2) to an *intoxicated* person (3) who, in consequence of such intoxication, causes injury to the person or property of another." (Emphasis added.) *Sanders* v. *Officers Club of Connecticut, Inc.*, 196 Conn. 341, 349, 493 A.2d 184 (1985). Proof of a particular blood alcohol level is not required to establish that Maloney was intoxicated either when served by The Pub Cafe or when the accident occurred.

The defendants contend that the results of the blood alcohol tests given over two hours after the accident had occurred and approximately three and one-half to four hours after The Pub Cafe had allegedly served Maloney for the final time should not have been admitted. First, with regard to the dram shop count, the defendants allege that the definition of "intoxication" varies from that of operation of a motor vehicle while "under the influence of intoxicating liquor," which can be established by a blood alcohol content of 0.10 percent pursuant to General Statutes § 14-227a (a) (2). The defendants argue, in essence, that, because a blood alcohol test is used to determine whether an individual is "under the influence" pursuant to General Statutes § 14-227a (a) (2), rather than "intoxicated" pursuant to § 30-102, the blood alcohol tests were improperly admitted on this count because they do not gauge "intoxication."

In *Sanders* v. *Officers Club of Connecticut, Inc.*, supra, 196 Conn. 349–50, our Supreme Court defined intoxication as follows: "To be intoxicated is something more

than to be merely under the influence of, or affected to some extent by, liquor. Intoxication means an abnormal mental or physical condition due to the influence of intoxicating liquors, a visible excitation of the passions and impairment of the judgment, or a derangement or impairment of physical functions and energies. When it is apparent that a person is under the influence of liquor, when his manner is unusual or abnormal and is reflected in his walk or conversation, when his ordinary judgment or common sense are disturbed or his usual will power temporarily suspended, when these or similar symptoms result from the use of liquor and are manifest, a person may be found to be intoxicated. He need not be 'dead-drunk.' ''

"The defendant appears to suggest that the Supreme Court and the legislature have recognized varying states of inebriation, with the state of being 'under the influence' of intoxicating liquor referring to a lesser level than 'intoxication.' . . . [W]e note that where the legislature has distinguished between levels of inebriation, it has not distinguished the phrase 'under the influence of intoxicating liquor' from 'intoxication.' See General Statutes § 14-227a (distinguishing driving while under the influence [blood alcohol 0.10 percent or greater] from driving while impaired [blood alcohol less than 0.10 percent but more than 0.07 percent]); *State* v. *Hancich,* 200 Conn. 615, 619–21, 513 A.2d 638 (1986). . . . While the Supreme Court in *Sanders* v. *Officers Club of Connecticut, Inc.,* supra, [196 Conn.] 349, stated that '[t]o be intoxicated is something more than to be merely under the influence of, or affected to some extent by, liquor,' the court gave no indication that its definition of intoxication was intended as a departure from its previous interpretations of the term 'under the influence' of intoxicating liquor. On the contrary, in the same paragraph, the court stated: 'When it is apparent that a person is under the influ-

ence of liquor, when his manner is unusual or abnormal and is reflected in his walk or conversation . . . a person may be found to be intoxicated.'. . . Id., 349–50." *State* v. *McKenna,* 11 Conn. App. 122, 130–32, 525 A.2d 1374, cert. denied, 205 Conn. 806, 531 A.2d 939 (1987) (discussing change in language of General Statutes § 53-56b from "intoxication" to "under the influence of intoxicating liquors" and propriety of jury instructions invoking language typical of "intoxication" definition).

Although § 30-102 is not a per se offense that can be proven merely by establishing a blood alcohol level of 0.10 percent or greater at the time the elements of the offense occurred, the results of the blood alcohol tests nonetheless may indicate that a person had imbibed intoxicating liquors, which is a key factor in determining whether an individual is intoxicated. Clearly, then, the results of the blood alcohol tests are relevant to a determination of intoxication for the purposes of § 30-102. Similarly, proof of common law wilful, wanton and reckless misconduct in the selling of alcohol does not require evidence of a specific blood alcohol level, but such evidence is nonetheless relevant to a determination whether the defendants acted in such a manner.

The defendants further contend, however, that the test results could not be introduced properly with regard to either count without expert evidence explaining the test results and extrapolating the results back to the time of the elements of the alleged offense. The defendants correctly assert that in a criminal prosecution for driving under the influence pursuant to General Statutes § 14-227a (a) (2), several procedural requirements must be met before a blood alcohol test can be introduced into evidence. For example, evidence establishing the relationship of the blood alcohol test to the individual's blood alcohol content at the time of

the offense must be presented. See General Statutes § 14-227a (c) (6); *State* v. *Geisler*, 22 Conn. App. 142, 160–62, 576 A.2d 1283, cert. denied, 215 Conn. 819, 576 A.2d 547 (1990), vacated on other grounds, 498 U.S. 1019, 111 S. Ct. 663, 112 L. Ed. 2d 657, aff'd on remand, 25 Conn. App. 282, 594 A.2d 985 (1991), aff'd, 222 Conn. 672, 610 A.2d 1225 (1992).

Section 14-227a (a) (2), unlike § 30-102 and the common law claim of wilful, wanton and reckless misconduct, is a per se criminal offense, which can be established upon proof of a blood alcohol content of 0.10 percent or greater at the time of the alleged offense. The procedural requirements set forth in § 14-227a (c) for the admissibility of blood alcohol tests have not been extended to actions brought pursuant to other statutes. See *State* v. *Singleton*, 174 Conn. 112, 115–16, 384 A.2d 334 (1977), cert. denied, 440 U.S. 947, 99 S. Ct. 1425, 59 L. Ed. 2d 635 (1979) (procedural requirements for admission of blood alcohol test in criminal prosecution for driving under influence not extended to prosecution pursuant to General Statutes § 53a-57); *Marshall* v. *DelPonte*, 27 Conn. App. 346, 353, 606 A.2d 716 (1992) (in administrative license revocation proceeding pursuant to General Statutes § 14-227b, standard of reliable and probative evidence does not require extrapolation testimony to establish that blood alcohol content was 0.10 percent or greater at time of offense if other evidence establishes blood alcohol content of 0.10 percent at time of offense); *State* v. *Geisler*, supra, 22 Conn. App. 166 (in conviction for § 53a-60d, assault in second degree with motor vehicle while under influence of intoxicating liquor, extrapolation of blood alcohol tests to time of offense not required, as defendant's behavior can corroborate accuracy of results of blood alcohol tests); *Futterleib* v. *Mr. Happy's, Inc.*, 16 Conn. App. 497, 506–507, 548 A.2d 728 (in general, procedural requirements for admission of blood test pursuant

to § 14-227a do not apply to civil actions brought under § 30-102 and common law wanton and reckless misconduct claim).[8]

In this case, the blood alcohol tests were offered as circumstantial evidence of both Maloney's intoxication at the time of the accident and Maloney's intoxication at the time of service. Having established that the results of the blood alcohol tests are relevant to the determinations of whether an individual is intoxicated pursuant to § 30-102 and whether The Pub Cafe dispensed alcohol in a wilful, wanton and reckless manner, we now examine whether the results of the tests performed on Maloney were sufficiently accurate, without extrapolation testimony, regarding his condition at the time of service and at the time of the accident. We conclude that the accuracy of the blood alcohol test with regard to Maloney's condition at the time of the accident was corroborated by a variety of other evi-

---

[8] We note that this court has in the past examined jury instructions concerning criminal charges other than those brought pursuant to General Statutes § 14-227a (a) (2) in which the trial court provided a misplaced emphasis on the nature of the blood alcohol test results in relation to the particular criminal offense charged. See *State* v. *LeRoy,* 16 Conn. App. 472, 478, 547 A.2d 940 (1988) (trial court, in its instructions on General Statutes [Rev. to 1983] § 53a-60d [a], assault in the second degree with a motor vehicle while intoxicated, improperly "added the weight of the statutory presumption to the jury's determination of whether the defendant was intoxicated"); *State* v. *Shaw,* 12 Conn. App. 294, 304, 530 A.2d 653 (1987) (trial court, in its instructions on General Statutes [Rev. to 1985] § 53a-56b, manslaughter in second degree with motor vehicle while intoxicated, improperly "added the heavy weight of the statutory presumption [of 'under the influence of intoxicating liquors' in § 14-227a] to the jury's determination of whether the defendant was intoxicated"). In this case, the defendants have not challenged the trial court's jury instructions regarding the tests, but rather, assert that the evidence was not properly admitted. We also note that the trial court, in charging the jury on the counts relating to The Pub Cafe, did not mention the blood alcohol test results. The court did, however, when instructing the jury on the count of negligence against codefendant Maloney, discuss that a violation of § 14-227a would establish negligence per se. The court explained the presumption concerning a blood alcohol content of 0.10 percent with regard to that offense.

dence presented. Maloney admitted that he intended to become intoxicated that night, related that he had approximately one to two beers and six to nine White Russians prior to his return to The Pub Cafe at approximately 11:30 p.m., stated that he was intoxicated when he returned to The Pub Cafe, and lost his memory of events after being served another White Russian upon his return to The Pub Cafe. Maloney subsequently drove his vehicle south in the northbound lane of Interstate 91 without having turned on his headlights, and collided with the plaintiff's vehicle. We further note that Maloney did not drink any alcohol or take any drugs between the time of the accident and the time of the blood alcohol tests.

With regard to providing circumstantial evidence addressed to the issue of Maloney's intoxication at the time of service, the test results are more problematic. Maloney's memory failed after being served at The Pub Cafe at approximately 11:30 p.m. The seventy-five to ninety minutes between Maloney's consumption of his drink and the accident can be reconstructed only to the extent of determining how he arrived at the accident scene. He had two open bottles of alcohol in his car at the time of the accident.[9] The blood alcohol test results as they related to the time of service may have been affected by other activities during the intervening time.

Although we conclude, for that reason, that the admission of the blood alcohol tests should have been limited to the issue of Maloney's condition at the time of the accident, the defendants have failed to prove that the unrestricted admission of the evidence was harmful with regard to either the dram shop count or the

[9] Maloney and the defendants' counsel engaged in the following exchange on cross-examination:

"[Defense Counsel]: Okay. Now you had two open bottles of alcohol in your car at the time of the accident; is that correct?

"[Witness]: That is correct."

wilful, wanton and reckless misconduct count. The plaintiff provided ample evidence that Maloney was intoxicated at the time of service. Maloney admitted that he intended to become intoxicated, related that he had approximately one to two beers and six to nine White Russians prior to his return to The Pub Cafe, stated that he was intoxicated when he returned to The Pub Cafe, and lost his memory of events subsequent to his return to The Pub Cafe. On the basis of that evidence, the jury reasonably could have concluded, by a preponderance of the evidence, that The Pub Cafe acted in a wilful, wanton and reckless manner in dispensing alcohol to Maloney, that Maloney was intoxicated when served by The Pub Cafe on the second occasion, and that, as a result of such intoxication, Maloney caused the collision on Interstate 91.

## II

### POLICE REPORT

The defendants next claim that Roche's police report, which contained Maloney's out-of-court statement that he had been "drinking in New Haven," should have been suppressed as inadmissible hearsay. The plaintiff contends that the statement is admissible as an exception to the hearsay rule either as an admission of a party opponent or as a declaration against penal interest, and, even if not admissible under one of these exceptions, that the admission constituted harmless error.

We first examine the plaintiff's contention that the statement was properly admitted under a hearsay exception as an admission of a party opponent. Such an "admission can be used *only* against the party who made it. *Palombizio* v. *Murphy,* 146 Conn. 352, 355–56, 150 A.2d 825 (1959); C. Tait & J. LaPlante, [Connecticut Evidence (1976)] § 11.5." (Emphasis added.) *In re Jason S.,* 9 Conn. App. 98, 104, 516 A.2d 1352 (1986). Unless a limiting instruction is requested, however, the

admission may be used against other parties as well. *Pluhowsky* v. *New Haven,* 151 Conn. 337, 343–44, 197 A.2d 645 (1964).

The statement in the report was made by the codefendant, Maloney. The defendants requested that the use of the report be limited, but the court failed to do so. Although we conclude that the evidence was improperly admitted as an admission of a party opponent with regard to The Pub Cafe, and that this admission constituted an abuse of discretion, the defendants have not established that the introduction of the report constituted harmful error.

"It is well recognized that any error in the admission of evidence does not require reversal of the resulting judgment if the improperly admitted evidence is merely cumulative of other validly admitted testimony. *Emhart Industries, Inc.* v. *Amalgamated Local Union 376, U. A. W.,* 190 Conn. 371, 391, 461 A.2d 422 (1983)." *Kimbrell* v. *Rossitto,* 6 Conn. App. 638, 653, 507 A.2d 120 (1986). Maloney had already testified to the substance of the contested statement. In fact, Maloney's testimony was much more specific than the information contained in the report. While the statement in the report described Maloney's drinking in "New Haven," Maloney testified specifically regarding the establishments where he drank in New Haven. Further, Roche had also testified, without objection, that Maloney had stated that he had been drinking in New Haven. Because the substance of the contested statement in the police report, therefore, already had been admitted, the admission of that portion of the police report was harmless.

## III

### DIRECTED VERDICT

The defendants next argue that the trial court improperly failed to grant their motion for a directed

verdict at the close of the plaintiff's case, as well as the renewal of that motion pursuant to Practice Book § 321 at the close of evidence, with regard to the claim of wilful, wanton and reckless conduct. We disagree.

"Our review of the trial court's refusal to direct a verdict is limited. [W]e view the evidence in the light most favorable to the plaintiff. . . . A directed verdict is justified if on the evidence the jury could not reasonably and legally reach any other conclusion than that embodied in [a verdict for the defendant] . . . or if the evidence is so weak that it would be proper for the court to set aside a verdict rendered for the other party. . . . When a jury has returned a verdict and the trial court has refused to set it aside, [t]he court's decision will be upheld on appeal if, from the evidence presented, the jury could reasonably have concluded as it did. (Citations omitted.) *Hall* v. *Winfrey,* 27 Conn. App. 154, 157–58, 604 A.2d 1334, cert. denied, 222 Conn. 903, 606 A.2d 1327 (1992); *Boehm* v. *Kish,* 201 Conn. 385, 388–89, 517 A.2d 624 (1986)." (Internal quotation marks omitted.) *Sullivan* v. *Norwalk,* 28 Conn. App. 449, 452, 612 A.2d 114 (1992).

"While we have attempted to draw definitional distinctions between the terms wilful, wanton or reckless, in practice the three terms have been treated as meaning the same thing. 'The result is that "wilful," "wanton," or "reckless" conduct tends to take on the aspect of highly unreasonable conduct, involving an extreme departure from ordinary care, in a situation where a high degree of danger is apparent. . . . It is at least clear . . . that such aggravated negligence must be more than any mere mistake resulting from inexperience, excitement, or confusion, and more than mere thoughtlessness or inadvertence, or simply inattention . . . .' W. Prosser & W. Keeton, Torts (5th Ed.) § 34, p. 214." *Dubay* v. *Irish,* supra, 207 Conn. 533.

Viewing the evidence presented most favorably to the plaintiff, we conclude that the jury reasonably, logically and legally could have found that the defendants had exercised wilful, wanton and reckless misconduct in selling alcohol to Maloney. "[I]t is the jury's right to draw logical deductions and make reasonable inferences from the facts proven . . . . (Citations omitted.) *Merola* v. *Burns,* 21 Conn. App. 633, 636, 575 A.2d 1025 (1990); *Sokolowski* v. *Medi Mart, Inc.,* [supra, 24 Conn. App. 285–86]." *Munson* v. *United Technologies Corp.,* supra, 28 Conn. App. 191. The plaintiff's case-in-chief included Maloney's testimony concerning his intent to become intoxicated, the number of drinks he had consumed, his opinion that he was intoxicated upon his return to The Pub Cafe, and the failure of his memory after having another White Russian at The Pub Cafe. The jury reasonably could have inferred from the evidence set forth that Maloney manifested signs of intoxication and, therefore, concluded that The Pub Cafe engaged in "highly unreasonable conduct, involving an extreme departure from ordinary care, in a situation where a high degree of danger is apparent."

## IV

### JURY INSTRUCTIONS

The defendants next contend that the trial court improperly failed to instruct the jury, pursuant to their request to charge, that wilful, wanton and reckless misconduct is more that gross negligence, that wilful misconduct is intentional misconduct, and that wanton misconduct is reckless misconduct, which is the equivalent of wilful misconduct.[10] The pertinent section of the

---

[10] The defendants also allege that the trial court improperly refused to instruct the jury that it had to return a verdict in favor of the defendants on the wilful, wanton and reckless misconduct count. On the basis of our conclusion that the trial court properly refused to render a directed verdict in favor of the defendants on this count, we also conclude that the trial court properly refused to instruct the jury to return a verdict in favor of the defendants.

court's instructions to the jury with regard to the wilful, wanton and reckless misconduct charge are as follows: "Recklessness involves highly unreasonable conduct involving an extreme departure from ordinary care in a situation where a high degree of danger is present. Recklessness requires a conscious choice of a course of action, either with knowledge that it would involve serious injury to other, or with knowledge of facts which would disclose the danger to any reasonable man. Reckless or wanton misconduct is such conduct as indicates a reckless disregard of the just rights or safety of others or of the consequence of actions. Therefore, if you find [that The Pub Cafe] served liquor beyond the point when Mr. Maloney was drunk, and they knew or should have known that Brian Maloney was already intoxicated, you may determine whether or not they did conduct themselves in a reckless, wanton and wilful way.

"Our Supreme Court, however, has stated the following: Wilful, wanton or reckless conduct tends to take on the aspect of highly unreasonable conduct involving an extreme departure from ordinary care in a situation where a high degree of danger is apparent. Furthermore, the state of mind amounting to recklessness may be inferred from conduct, but in order to infer it there must be something more that a failure to exercise a reasonable degree of watchfulness."

"The court is under no duty at any time to charge in the exact language requested. . . . Failure to charge precisely as proposed by a defendant is not error where the point is fairly covered in the charge. . . . Instructions are adequate if they give the jury a clear understanding of the issues and proper guidance in determining those issues." (Citations omitted.) *Tomczuk* v. *Alvarez,* 184 Conn. 182, 190, 439 A.2d 935 (1981); *State* v. *Commerford,* 30 Conn. App. 26, 32, 618 A.2d 574, cert. denied, 225 Conn. 903, 621 A.2d 285 (1993).

Although the defendants correctly stated the law with regard to the notion of wilful, wanton and reckless misconduct, the trial court also correctly stated the law in its instructions. On the basis of the instructions given by the trial court, we conclude that the trial court adequately apprised the jury of the nature of wilful, wanton and reckless misconduct by providing it with "a clear understanding of the issues and proper guidance in determining those issues." Id., 190.

The judgment is affirmed; the plaintiff's motion to withdraw the cross appeal is granted.

In this opinion the other judges concurred.